UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES TILLEY,                      )
                                   )
          Petitioner,              )
                                   )
     vs.                           )          No. 4:06CV1822 ERW/AGF
                                   )
TROY STEELE,                       )
                                   )
          Respondent.              )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pro se petition of Missouri state prisoner,

James Tilley, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action was

referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended

disposition. For the reasons set forth below, the Court recommends that federal habeas

relief be denied.

Petitioner was convicted by a jury on December 19, 2001, of attempt to

manufacture methamphetamine, in violation of Mo. Rev. Stat. § 195.211(Count I);

possession of methamphetamine, in violation of Mo. Rev. Stat. § 195.202 (Count II); and

possession of precursor chemicals with the intent to manufacture methamphetamine, in

violation of Mo. Rev. Stat. § 195.420 (Count III). He was sentenced as a prior and

persistent felony drug offender to three concurrent 20-year terms of imprisonment. The

convictions and sentences were affirmed on direct appeal, and Petitioner was denied state

postconviction relief.   In the present action, Petitioner asserts that his convictions were

obtained in violation of his constitutional rights in the following ways:

> (1) the trial court failed to declare a mistrial sua sponte due to a conflict of interest on defense counsel's part that arose as a result of counsel's dual representation of Petitioner and another individual (Roger Graviett) who was charged with Petitioner as a result of the same drug activities that took place at Petitioner's house;

> (2) there was insufficient evidence to support the conviction of Count I (attempt to manufacture);

> (3) there was insufficient evidence to support the conviction of Count III (possession of precursor ingredients with intent to manufacture);

> (4) conviction of both Counts I and III violated double jeopardy;

> (5) the trial court improperly ruled that Petitioner could not place into evidence a note from Graviett that exonerated Petitioner;

> (6) defense and direct appeal counsel rendered ineffective assistance by failing to object to the verdict director on Count III (Instruction No. 12), which failed to conform with the applicable Missouri Approved Instruction, MAI-CR3d 325.34; and

> (7) trial counsel and appellate counsel rendered ineffective assistance by failing to preserve/raise the above double jeopardy claim.

Respondent argues that habeas relief should be denied because Petitioner's first

and fourth claim was procedurally defaulted in state court, and, alternatively, fail on the

merits; and the remaining claims were reasonably adjudicated by the state courts.

# BACKGROUND

## Trial

In affirming Petitioner's conviction and sentence, the Missouri Court of Appeals summarized the evidence at trial as follows. Petitioner does not challenge this summary and the Court finds it to be both accurate and fair.

> On April 13, 2001, deputy sheriff Sullivan ("Sullivan") learned via a female informant that she had been at Defendant's house "the night before." While she was there, she received methamphetamine that "was pulled from underneath the cabinet between the kitchen and the living room."

> Based on that information, Sullivan and sheriff's deputy Penrod ("Penrod") went to Defendant's house at 1666 County Road 216 near Chaffee, Missouri. When they arrived, Defendant "was on the roof of a shed that was just southwest of the residence." Another person (later identified as Roger Graviett) came out the front door of the house. Penrod moved toward Graviett to speak with him, while Sullivan went to the shed to talk to Defendant.

> Sullivan testified he "hollered up to" Defendant and asked him to come down and talk. Defendant stepped to the edge of the shed roof and stated he would come down. Thereon, Defendant turned and walked away from the roof edge. Sullivan anticipated Defendant was proceeding to the back of the shed where a ladder was located; consequently, Sullivan went to meet Defendant at the bottom of the ladder. After getting to the back and waiting "for a few seconds" without Defendant appearing, Sullivan stepped back so he "could see over the ladder." Although the shed was "small," Sullivan could not see Defendant; consequently, he walked to the front of the shed. When Sullivan still could not see Defendant, he returned to the ladder and viewed Defendant starting down the ladder. The foregoing caused Sullivan to wonder what Defendant was doing because it was a small roof, yet Sullivan had to walk around to look for Defendant. He also noted there were no tools on the roof.

> After Defendant was on the ground, Sullivan told him about the informant and asked permission to search his house. Defendant consented to the search. Penrod then entered the house while Sullivan stayed outside with

Defendant and Graviett. When Penrod returned in "barely" over a minute, he indicated to Sullivan he found methamphetamine in the cabinet location described by the informant. The deputies then arrested Graviett and Defendant, called for a transport deputy, and began a more thorough search of the house.

Sullivan started the search in a "utility room" located between the bathroom and the back wall of a bedroom. There, he found a "duffel bag" in the middle of the floor. Knowing methamphetamine labs are often mobile and components thereof are often transported in this manner, Sullivan promptly opened the bag. Inside, he found a pint of Liquid Fire, two large spoons, a spatula, Aqua airline tubing, rubber gloves, side cutters, vice grips, plastic bags, coffee filters, plastic spoons, a hot plate, salt (contained in a plastic bag), and two Energizer lithium batteries. The two batteries were in a package designed to hold four batteries.

After seizing the duffel bag and its contents, Sullivan recalled Defendant's delay in descending the shed roof. Accordingly, he went to the roof where he found a "spot of white powder that was smashed in the shingles." He collected a sample of that powder, and a subsequent analysis thereof revealed it was methamphetamine.

Meanwhile, Penrod finished searching the kitchen area. In doing so, he found empty plastic bags in a trash can located in the kitchen. These empty bags contained a residue, i.e., "a real fine powder that they weren't able to scrape out when they were cleaning the bag out." This powder residue tested positive for methamphetamine.

The medicine cabinet, in the only bathroom in Defendant's home, contained two syringes. Penrod testified this fact was of "particular interest" because (1) some methamphetamine users inject the drug with this type of syringe, and (2) he found nothing in the bathroom to indicate a "medicinal purpose for the syringes," i.e., he found no "insulin or anything as such."

At trial, Sullivan testified that each item in the duffel bag was commonly used by persons who manufacture methamphetamine using the anhydrous ammonia method and explained in detail the function of each. Moreover, he testified that based on what he found in the bag and the fact that methamphetamine was in the house, it was his opinion that a substantial step had been taken toward the manufacture of methamphetamine. Penrod testified the "white" color of the methamphetamine found at Petitioner's

house indicated it came from a "newer" batch, i.e., chemical evaporation
will cause methamphetamine to darken over time.
(Resp. Ex. 6.)

To the above, the Court adds the following. Graviett was also charged with violations of controlled substance laws based on the above events, and both he and Petitioner were represented by the same public defender, Christopher Davis. On June 28, 2001, Graviett pleaded guilty to possession of chemicals with the intent to manufacture methamphetamine, and on August 23, 2001, approximately four months prior to Petitioner's trial, Graviett was sentenced to probation with a "back-up" sentence of 15 years. (Resp. Ex. 1 at 130-35, 146-47.)[1]

Called as a witness for Petitioner, Graviett testified that on April 13, 2001, he was living at Petitioner's house; Petitioner was gone for two or three days staying with his girlfriend; a friend of Graviett's gave Graviett some methamphetamine in exchange for allowing him to leave the duffel bag at Petitioner's house; the duffel bag was left there without Petitioner's knowledge; Graviett did not look inside the bag but knew "about what was there"; Petitioner had just returned from his girlfriend's home and had not been inside his house at the time the police arrived; Petitioner knew nothing about the duffel bag, its contents, or the arrangement Graviett had regarding the duffel bag; and Petitioner

_____

[1]        According to www.courts.mo.gov/casenet/cases case no. 33R050100639-01, Graviett pleaded guilty to attempt to manufacture methamphetamine.

knew nothing about the methamphetamine found in the kitchen and on the shed roof, all of which belonged to Graviett.  <u>Id.</u> at 125-31.

On cross-examination, Graviett admitted that he did not tell the prosecuting attorney or the police that Petitioner did not know anything about the contraband at the house.  When asked why he had waited until Petitioner's trial to claim that Petitioner had nothing to do with the offenses, Graviett provided several responses, essentially stating that he did not think that it would do any good or that the police would listen.  He also testified, however, that he gave Davis "a piece of paper that said it was all my fault and I [sic] had no idea."  With regard to his own charges, Graviett testified on cross-examination that he did not know what was inside the bag and that he had pleaded guilty "to manufacturing" only to stay out of jail.  <u>Id.</u> at 132-46.

At a side bar conference during redirect examination of Graviett, the prosecutor objected to defense counsel's anticipated introduction into evidence of a short undated note Graviett had written and given to Davis.  In the note, dated June 5, he stated:  "I Roger Graviett take all responsibility [sic] actions against me."  It further stated that Petitioner had no knowledge of this activity, was not present at the house at the time, and had been staying at his girlfriend's house from April 11 to13.  (Resp. Ex. 2 at 55.)  The State objected on the ground that the note was unauthenticated and had not been disclosed in response to discovery requests.  Defense counsel argued that the prosecutor "opened the door by questioning that he [Graviett] never told anybody about it, and this

note was given to me on June 5th for me to do with what I pleased." The court stated as follows:

> I think we are opening a whole bunch of doors because if he [Graviett] takes responsibility for all of his actions, then your plea bargain of the 28th is probably not based on that letter. You put this in, they are going to refile on all the charges against your guy.

(Resp. Ex. 1 at 148.)

The prosecutor repeated that the letter had never been disclosed to the State and added: "Certainly that would very well had [sic] a large impact on any plea negotiation." The court sustained the prosecutor's objection based on non-disclosure and Petitioner proceeded with the trial without making an offer of proof regarding the letter or seeking a mistrial based on a conflict of interest on Davis's part due to his representation of Petitioner and Graviett. Continuing with redirect, Graviett testified that he had told Davis "the first time I met you" that Petitioner did not know about Graviett's drug activity at the house. After Graviett had already answered the question, the prosecutor objected and the court sustained the objection, stating: "I think I will sustain your objection. I think you are opening some doors here. I will sustain the objection." The court did not specifically tell the jury to disregard the testimony, nor did the prosecutor ask the court to do so. On recross examination, Graviett acknowledged that on the advice of Davis, he pleaded guilty to an offense he did not commit, but that he did not wish to withdraw the plea because he was satisfied being on probation. Graviett stated that he was "just trying to clear this up," because it was all his fault and not Petitioner's. Id. at 148-50.

The verdict director on Count III, the possession of precursors with the intent to manufacture methamphetamine (Instruction No. 12), told the jury to find Petitioner guilty of this charge if it believed from the evidence beyond a reasonable doubt:

> First, that on or about April 13, 2001, in the County of Scott, State of Missouri, the defendant knowingly possessed liquid fire, salt, and lithium, and
>
> Second, that the defendant knew of the presence of these items and their nature, and
>
> Third, that the defendant did so with the intent to possess liquid fire, salt, and lithium to create methamphetamine, a controlled substance.

(Resp. Ex. 2 at 44.)

## Direct Appeal

On direct appeal, Petitioner raised the first five claims that he raises in the present habeas action, as set forth above. With respect to his conflict-of-interest claim, he argued that when Graviett testified on cross examination that he did not know what was in the duffle bag, an actual conflict of interest arose on Davis's part that adversely affected Petitioner. Noting that it was Davis's nondisclosure of Graviett's letter to the prosecutor that prevented introduction of the letter at Petitioner's trial, Petitioner theorized that perhaps Davis did not disclose Graviett's letter because the letter would have caused the state to offer a harsher sentence recommendation to Graviett. Petitioner also posited that Davis could not disclose the letter because it was a confidential communication from a client.

Petitioner argued in addition that it was Davis's dual representation that prevented introduction into evidence of Graviett's testimony that Graviett told Davis the first time he met Davis that Petitioner had no knowledge of the contraband at the house. According to Petitioner, the trial court sustained the prosecutor's objection to this testimony because the testimony involved a privileged communication between Davis and Graviett. A third adverse effect of the dual representation asserted by Petitioner was that the prosecutor was able to disparage Davis, and by association Petitioner, in the eyes of the jury by adducing that Davis had advised Graviett to plead guilty to an offense he did not commit. Petitioner argued that the court committed plain error when it did not sua sponte declare a mistrial after Davis was unable to rehabilitate Graviett by means of prior consistent statements -- the letter and the "first time I met you" testimony -- due to circumstances arising out of Davis's dual representation.[2]

Petitioner stated that this issue was not properly preserved for review because no request for a mistrial was made when Graviett told the jury that he did not know what was in the duffle bag. Accordingly, Petitioner asked the appellate court to review the issue for plain error. (Resp. Ex. 3 at 19-24, Resp. Ex. 5 at 7-12.)

---

[2]     These arguments were also raised by Petitioner in a motion for a new trial, which the trial court denied. (Resp. Ex. 1 Vol. II at 190-94.)

The Missouri Court of Appeals held that there was no error, plain or otherwise, resulting from the trial court's failure to declare a mistrial based upon an alleged conflict-of-interest. The court explained as follows:

> First, we are not persuaded any such conflict existed. This follows because Davis negotiated a plea agreement wherein Graviett admitted possessing the subject items with the intent to manufacture methamphetamine. Graviett's letter to Davis was consistent with what Graviett later admitted when he pleaded guilty. Consequently, Davis could not have reasonably foreseen, as he prepared for Defendant's trial, that the letter would become relevant.

> Second, even if the letter had been disclosed in response to the prosecutor's discovery request, the trial court could have properly ruled it inadmissible as it was merely cumulative of Graviett's testimony. Graviett testified [Petitioner] had no knowledge of the bag or its contents being in [Petitioner's] home. He accepted responsibility for such at Petitioner's trial. Moreover, Graviett's testimony was that he gave Davis this information before he pleaded guilty, i.e., "the first time I met you." From this, the jury would obviously have known that such a statement, if made to Davis, was not a recent fabrication of Graviett's claim of sole responsibility. Consequently, the "first time they met" testimony was as "rehabilitative" as the letter would have been. A court does not plainly err, when for any reason, it excludes merely cumulative evidence.

The state appellate court noted that although the "first time I met you" testimony was objected to by the State and the objection was sustained, the objection and ruling came after Graviett had given his answer, that the State did not ask the court to strike the answer or instruct the jury to disregard it, and that the court did not do so sua sponte. Citing Missouri case law, the appellate court stated that "consequently, this evidence was still available for the jury to consider." (Resp. Ex. 6.)

The Missouri Court of Appeals next held that the evidence was sufficient to support the conviction of possessing precursor chemicals of methamphetamine with the

intent to manufacture methamphetamine (Count III).  The court held that the jury could have reasonably inferred from the evidence that Petitioner was the principal occupant of the house with routine access to the kitchen, utility room, and bathroom, locations where methamphetamine or methamphetamine paraphernalia were found; and that this, together with Petitioner's actual possession of newly-processed methamphetamine, supported the further inference that he knew the duffel bag contained chemicals and paraphernalia used to manufacture methamphetamine.  Id.

The appellate court similarly found that the evidence was sufficient to support the conviction of attempting to manufacture methamphetamine (Count I).  The court pointed to the evidence that Petitioner had either actual or constructive possession of the duffel bag found in his utility room, along with its contents, expert testimony established that the contents were items routinely used in illicit manufacture of methamphetamine, and Petitioner was found in actual possession of freshly-manufactured methamphetamine.  Id.

The court held that, by failing to raise such a claim at trial or in his post-trial motion, Petitioner waived appellate consideration of his contention that possession of precursor ingredients with the intent to manufacture methamphetamine was a lesser included offense of attempting to manufacture methamphetamine, and that a conviction of both offenses violated double jeopardy.  Lastly, the appellate court held that it was not plain error for the trial court to exclude Graviett's note because, according to the appellate court, the note was "merely cumulative," as everything in the note was put

before the jury via Graviett's testimony, as was the fact that Graviett told Davis the first time they met of his own involvement and Petitioner's non-involvement in the crimes.  Id.

**State Postconviction Proceedings**

The only claims raised by Petitioner on appeal from the denial of his motion for postconviction relief under Missouri Supreme Court Rule 29.15, were that defense and direct appeal counsel were ineffective for failing to challenge (1) Instruction No. 12, and (2) the submission to the jury of both Counts I and III in violation of Plaintiff's double jeopardy rights.  The motion court denied these claims without holding an evidentiary hearing.  The court held that Instruction No. 12 was erroneous for not following the Notes on Use of MAI-CR 325.34, in that it required a finding that Petitioner possessed the precursors "with the intent to possess" them "to create" methamphetamine, rather than a finding that Petitioner possessed the precursors with the intent to "convert," "process," or "alter" them "to create" methamphetamine.  But the court found that when read as a whole, the instruction properly required the jury to find that Petitioner intended to use the precursors to create methamphetamine.  Thus, Petitioner was not prejudiced by the instructional error.  (Resp. Ex. 11.)

The motion court held that Petitioner's convictions for attempting to manufacture methamphetamine, in violation of Mo. Rev. Stat. § 195.211.1, and possession of precursor chemicals with the intent to manufacture methamphetamine, in violation of Mo. Rev. Stat. § 195.420.1, did not violate double jeopardy.  Petitioner argued that he could not have been in possession of precursors needed to manufacture methamphetamine, so as

to make him guilty of attempting to manufacture under Count I, without being aware of the presence of the precursors with the intent to manufacture methamphetamine, and therefore, also guilty under Count III. In rejecting this argument, the motion court reasoned that double jeopardy was not violated because possession of a precursor ingredient was not a required element of attempt to manufacture, and conduct satisfying the substantial-step element of an attempt to manufacture was not an element of possession of a precursor with intent to manufacture. The motion court held it was thus evident under Missouri's cumulative punishment statute, Mo. Rev. Stat. § 556.041,[3] that the Missouri legislature intended to punish offenders such as Petitioner under both § 195.211 and § 195.420, even when the two convictions were based on the same conduct. Accordingly, concluded the motion court, defense counsel and appellate counsel were not ineffective for failing to preserve/raise a non-meritorious double jeopardy claim. (Resp. Ex. 8 at 39-54.) The Missouri Court of Appeals found that the motion court's above findings and conclusions were not clearly erroneous. Id.

---

[3]     Section 556.041(1) provides that a defendant whose conduct may establish the commission of one or more offenses may not be convicted "of more than one offense if . . . [o]ne offense is included in the other, as defined in section 556.046." Section 556.046 provides that an offense is included in the other when (1) it is established by proof of the same or lesser facts necessary to show the commission of the other offense; (2) the statute specifically denominates the offense as a lesser degree of the other offense; or (3) it consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.

## DISCUSSION

**Procedural Default and Standard of Review**

Respondent argues that Petitioner's free-standing double jeopardy claim is not properly before this Court because the claim was procedurally defaulted in state court. Because the merits of the double jeopardy claim underlie consideration of Petitioner's properly-preserved claim that defense and direct appeal counsel were ineffective for not raising the claim, the Court will not engage in a procedural default analysis. See Nance v. Norris, 392 F.3d 284, 291 (8th Cir. 2004) (explaining that a federal habeas court may by-pass a procedural default question and proceed to the merits).

Respondent also argues that because the state appellate court reviewed Petitioner's first claim listed above (trial court's failure to declare a mistrial due to defense counsel's conflict-of-interest) for plain error, this Court is procedurally barred from considering the claim. Currently, there is a split within the Eighth Circuit with respect to whether plain error review by the state appellate court "cures" a procedural default. Shelton v. Purkett, 563 F.3d 404, 408 (2009). This Court, to err on the side of caution, will follow the line of cases permitting federal habeas review in such circumstances, mindful that such review is for "manifest injustice," coupled with the deferential standard of review mandated in habeas cases by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Id.

Under AEDPA, when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The term "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court]'s decisions as of the time of the relevant state-court decision."  Carey v. Musladin, 549 U.S. 70, 74 (2006) (citation omitted).  A decision by a state court is "contrary to" clearly established federal law if it "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases'" or if it "'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)).  A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

> A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied

> [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's
> burden to show that the state court applied that case to the facts of his case
> in an objectively unreasonable manner.

Price, 538 U.S. at 641 (internal quotations and citations omitted); see also Barnett v.

Roper, 541 F.3d 804, 811 (8th Cir. 2008).

The factual findings of the state court also may be challenged in a § 2254 petition,

but they are subject to "an even more deferential review." Kinder v. Bowersox, 272 F.3d

532, 538 (8th Cir. 2001). Factual findings by the state court "shall be presumed to be

correct," a presumption that will be rebutted only by "clear and convincing evidence."

Id.; § 2254(e)(1).

## **Conflict of Interest**

Petitioner argues that the trial court plainly erred in not declaring a mistrial when it

became clear that Davis had a conflict of interest. Petitioner argues that (1) Davis's

representation of Graviett may have been the cause of the nondisclosure of Graviett's

note, (2) the state was able to cast Davis, and by association Petitioner, in a poor light by

adducing in cross-examination of Graviett that Davis had advised Graviett to plead guilty

to an offense he did not commit, and (3) Davis's prior representation of Graviett

somehow limited his ability to rehabilitate Graviett after Graviett contradicted on cross-

examination his testimony on direct examination that he knew what was in the duffle bag.

As a general matter, to establish a violation of the right to counsel, a criminal

defendant must demonstrate "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland

v. Washington, 466 U.S. 668, 685-686 (1984).  An exception to this rule exists where a defendant's lawyer had an "actual conflict of interest" in which the lawyer "actively represented conflicting interests."  In such a case the defendant need only demonstrate that the actual conflict "adversely affected his lawyer's performance" in order to prove a violation of the Sixth Amendment.  Cuyler v. Sullivan, 446 U.S. 335, 348, 350 (1980); see also Mickens v. Taylor, 535 U.S. 162, 172 (2002).

In Mickens, the Supreme Court left open the question of whether the Sullivan "adverse affect" standard applied to "a conflict rooted in counsel's obligations to former clients."  535 U.S. at 174-75.  Here, the Court concludes that even under the Sullivan "adverse affect" standard, Petitioner's conflict-of-interest claim fails, and with it his claim that the trial court should have sua sponte declared a mistrial.

In Covey v. United States, 377 F.3d 903 (8th Cir. 2004), the Eighth Circuit explained that "adverse affect" in this context "means that the conflict caused the attorney's choice, not that the choice was prejudicial in any other way.'"  377 F.3d at 908 (quoting McFarland v. Yukins, 356 F.3d 688, 706 (6th Cir. 2004) ("Although the choice caused by the conflict does not have to be prejudicial in the sense of causing the defendant to lose the case, the reasonableness of counsel's choice can be relevant as a factor in proving the choice was caused by the conflict.  A defendant or habeas petitioner does not have to produce direct evidence, such as the lawyer's testimony, that the lawyer chose to do one thing rather than another in order to accommodate another client's interests."));  see also Koste v. Dormire, 345 F.3d 974, 982-83 (8th Cir. 2003) ("As a

practical matter, we understand [the Sullivan] standard to require [a habeas petitioner] to show that [defense counsel's] performance was actually deficient in some specific way and that the deficiency was causally connected to the conflict of interest.") To show that the conflict caused defense counsel's choice to engage or not to engage in particular conduct, a habeas petitioner must identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict. Winfield v. Roper, 460 F.3d 1026, 1039 (8th Cir. 2006) (citing Covey, 377 F.3d at 908).

The first question in this case is whether Davis's representation of Petitioner and Graviett affected Davis's course of action with respect to evidence by Graviett on Petitioner's behalf. With respect to the nondisclosure of the note, the question can also be framed as follows: Was counsel's failure to produce the note prior to trial linked to an actual conflict of interest?

This Court has some question regarding the state appellate court's conclusion that even had the note been disclosed to the prosecutor, the trial court might have precluded it as merely cumulative of Graviett's testimony. Nevertheless, the Court concludes that Petitioner has not shown that his right to conflict-free counsel was violated. This Court does not discern a link between Davis's representation of Graviett and the failure to disclose Graviett's note to the prosecutor in the context of Petitioner's trial. By the time of trial, Graviett had already pleaded guilty and been sentenced. Further, at the trial,

counsel explicitly elicited Graviett's testimony that he (Graviett) was responsible for the duffle bag and the methamphetamine at the residence, as well as Petitioner's lack of knowledge regarding these items -- testimony that was wholly consistent with the note. The Court notes that Petitioner has never asserted a claim that Davis was ineffective for failing to disclose the note during discovery.[4]

Nor does the record support Petitioner's further assertion that the note was not produced because it was a confidential communication. Graviett apparently waived any such confidentiality when he provided the note to counsel, and unequivocally did so when he agreed to testify and testified as to its content. As such, Petitioner has failed to show that the failure to produce the note in discovery was linked to any conflict of interest.

The next question is whether Davis's representation of Graviett adversely affected his representation of Petitioner after Graviett testified on cross-examination that he did not know what was in the duffle bag and therefore had pleaded guilty to an offense he did not commit. Upon careful consideration of the matter, the Court concludes that this testimony did not create a direct conflict of interest, as Petitioner suggests. Although in cross-examination Graviett may have retreated somewhat from his prior testimony that he knew "about what" was in the duffle bag, he at no time suggested that Petitioner knew

---

[4] The Court is not suggesting that Petitioner would have prevailed on such a claim. Petitioner's claim that the exclusion of the note violated Petitioner's due process rights is dealt with below.

what was in the duffle bag or denied that he (Graviett) was the one who had allowed his friend to store the duffle bag at the house. Moreover, Graviett's and Petitioner's interests in fact converged at that point, as it was in both Graviett's and Petitioner's interest for Davis to rehabilitate Graviett as a person who told the truth in his direct examination. While the Court believes that representation of two defendants on charges arising out of the same facts should be avoided, so as not to place counsel in a potentially conflicted position at trial, there is nothing in the record here to suggest that counsel in any way limited his questioning of Graviett on Petitioner's behalf on this or any other subject. Nor is there any reason to believe that the trial court would have overruled the prosecutor's objection to Graviett's testimony on redirect examination -- that he told his plea counsel the first time they met that Petitioner was not involved in the drug offenses -- had a different attorney represented Graviett in Graviett's plea proceedings.

Lastly, from a review of the record, the Court is not persuaded by the argument that Davis's representation of Graviett resulted in the jury seeing Davis in a bad light, and by inference seeing his present client, Petitioner, in a bad light, to the extent that Petitioner was deprived of his right to conflict-free counsel. To the contrary, Graviett plainly and repeatedly explained his motivation both in pleading guilty and in coming forward to testify on Petitioner's behalf. And to the extent Graviett suggested that he did not know what was in the duffle bag, the state was able to impeach Graviett with his own prior inconsistent statements regarding his knowledge of what was in the duffle bag. (Resp. Ex. 1 at 142-43.)

In sum, no manifest injustice resulted from Davis's representation of Graviett and Petitioner, nor, consequently, from the trial court's failure to declare a mistrial at any point, due to this dual representation.

**Sufficiency of the Evidence**

Petitioner asserts that his due process rights were violated because there was insufficient evidence from which the jury could have found that he was guilty of attempting to manufacture methamphetamine, and of possession of precursor ingredients with the intent to manufacture methamphetamine. The due process clause prohibits the conviction of an accused "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). In the § 2254 setting, the federal court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Evans v. Luebbers, 371 F.3d 438, 441 (8th Cir. 2004).

Upon review of the record, the Court concludes that the state appellate court very reasonably concluded that the evidence was sufficient to support both convictions in question.

**Evidentiary Rulings**

As noted above, Petitioner argues that his constitutional rights were violated by the trial court's exclusion of Graviett's note on recross examination, and his testimony about

the note on redirect examination.  It is not within a federal habeas court's province "to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Only evidentiary rulings that are "so grossly prejudicial that they fatally infect the entire trial, preventing it from being fundamentally fair, will justify habeas corpus relief."  Henderson v. Norris, 118 F.3d 1283, 1286 (8th Cir. 1997) (citation omitted); see also Weston v. Dormire, 272 F.3d 1109, 1113 (8th Cir. 2001).  "To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety the verdict probably would have been different."  Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997) (citation omitted); see also Bounds v. Delo, 151 F.3d, 1116, 1119 (8th Cir. 1998).

Here, the Court cannot say that it was improper to exclude the note on the ground that it had not been disclosed during discovery.  Furthermore, while Graviett's note would have undercut the prosecutor's attempt to show that Graviett's testimony that Petitioner did not know about the drug activity at the house was recently fabricated, this Court cannot say that exclusion of the note, or Graviett's testimony on redirect about the note, so infected the trial as to render the trial fundamentally unfair.  As noted above, during direct examination, Graviett was able to testify that although he had not previously told the prosecutor or police that Petitioner was not involved in the offenses, Graviett had previously informed Davis of this fact.  And in redirect, he again testified that he told his

attorney about Petitioner's lack of knowledge the first time Graviett met with Davis.[5]  As

the testimony was not stricken, under Missouri law, Graviett's response in redirect was

also available for the jury to consider.

**Ineffective Assistance of Counsel - Double Jeopardy Claim**

Petitioner argues that trial counsel and appellate counsel rendered ineffective

assistance by failing to preserve/raise the claim that conviction of both attempting to

manufacture and possessing precursor ingredients with the intent to manufacture violated

the Double Jeopardy clause.  The Sixth Amendment guarantees a criminal defendant the

right to effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686

(1984).  To prevail on a claim of ineffective assistance of counsel, a habeas petitioner

must show that "counsel's representation fell below an objective standard of

reasonableness," and that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 689.

Moreover, in the context of a § 2254 petition, a petitioner must do more than

"show that he would have satisfied Strickland's test if his claims were being analyzed in

the first instance.  Under AEDPA, he must establish that the state court applied Strickland

to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S.

685, 698-99 (2002); see also Ringo v. Roper, 472 F.3d 1001, 1003 (8th Cir. 2007).

---

[5]  That this testimony was elicited by the very attorney to whom Graviett made the
disclosure may, in fact, have served to bolster its credibility.

One of the prohibitions of the Double Jeopardy Clause in the United States Constitution is the prohibition against "multiple punishments for the same offense." Brown v. Ohio, 432 U.S. 161, 165 (1977) (citation omitted). However, "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366 (1983). Federal habeas courts are bound by a state court's construction of its own statutes in this context. Id. at 368.

Thus, "[w]hile the double-jeopardy clause of the Fifth Amendment bars multiple *trials* for the same offense, it does not bar multiple *punishments* for the same conduct if the legislature has authorized the same." Ursery v. Steele, No. 4:06CV1768 UNA, 2007 WL 2767215, at *3 (E.D. Mo. Sept. 19, 2007); see also Williams v. Dwyer, No. 4:05CV00040 ERW, 2008 WL 346348, at *5 (E.D. Mo. Feb. 6, 2008) ("Double jeopardy analysis regarding multiple punishments is limited to determining whether cumulative punishments were intended by the legislature.").

Here, the issue is whether the Missouri legislature authorized cumulative punishment for both (1) attempting to manufacture methamphetamine and (2) possessing precursor chemicals with the intent to manufacture methamphetamine. This is the question that the state courts addressed and this Court concludes that those courts did not unreasonably apply federal law regarding a criminal defendant's double jeopardy rights. Cf. United States v. Beltz, 385 F.3d 1158, 1162 (8th Cir. 2004) (finding no double jeopardy bar to prosecution under federal law for possessing pseudoephedrine with

- 24 -

reasonable cause to believe chemical would be used to manufacture methamphetamine, and attempting to manufacture methamphetamine, because charges require different elements of proof).   It follows that the state courts did not unreasonably apply <u>Strickland</u> in rejecting Petitioner's claims of ineffective assistance of defense and appellate counsel for failing to make a meritless double-jeopardy argument.  <u>See Williams</u>, 2008 WL 346348 at *5 (holding that neither trial counsel nor appellate counsel provided ineffective assistance in failing to make a meritless double jeopardy argument).

**<u>Ineffective Assistance of Counsel - Instructional Error Claim</u>**

Petitioner argues that defense and direct appeal counsel rendered ineffective assistance by failing to object to the verdict director on Count III (Instruction No. 12) which failed to conform with MAI-CR3d 325.34.  Upon review of the record, the Court concludes that the state courts reasonably determined that defense and direct appeal counsel's failure to raise claims regarding Instruction No. 12 did not constitute ineffective assistance because the instruction itself was adequate.  The Supreme Court has held that the fact that an instruction deviated from a state's standard instructions is not a basis for habeas relief; rather, instructional error "only rises to the level of a constitutional issue where the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process."  <u>Estelle</u>, 502 U.S. at 71-72 (citation omitted).

To satisfy due process, a jury instruction must require the state to prove beyond a reasonable doubt the elements of the crime with which a defendant is charged. <u>Sandstrom v. Montana</u>, 442 U.S. 510, 513 (1979).  Here, the state appellate court

reasonably determined that the acknowledged error in Instruction No. 12 did not deprive Petitioner of a fair trial. When read as a whole, Instruction No. 12 did not permit the jury to find Petitioner guilty of possessing precursor chemicals with the intent to manufacture methamphetamine, unless it found all the elements of the offense. See Roberts v. Bowersox, No. 4:007CV02102 ERW, 2009 WL 2836475, at *16 (E.D. Mo. Aug. 27, 2009) (holding that state courts reasonably applied Strickland to deny claims of ineffective assistance of defense counsel and direct appeal counsel for not challenging an instruction that did not violate due process); Jackson v. Steele, No. 4:08CV650MLM, 2009 WL 350633, at *21 (E.D. Mo. Feb. 10, 2009) (holding that verdict directors that did not define certain terms did not violate habeas petitioner's due process rights where omissions would not have affected jury's deliberations).

## **CONCLUSION**

Petitioner is not entitled to federal habeas relief. Furthermore, the Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. §2254(d)(2). See Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (standard for issuing a Certificate of Appealability) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of James Tilley for habeas corpus relief be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability not be

issued in this case.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of December, 2009.